# UNITED STATES DISTRICT COURT
# DISTRICT OF NEBRASKA

| | |
|---|---|
| **JILL STOGDILL**, an individual,<br><br>Plaintiff, | Case No. 8:18-CV-_____ |
| v. | |
| **DOUGLAS COUNTY SCHOOL DISTRICT NO. 17**, commonly known as **MILLARD PUBLIC SCHOOL DISTRICT**, a political subdivision of the **State of Nebraska**,<br><br>Defendant. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**Trial Location: Omaha, Nebraska** |

## FACTUAL BASIS

1. Jill Stogdill ("Ms. Stogdill") is female. Millard Public School District ("MPSD") employed Ms. Stogdill for more than 11 years, as an English teacher for 10 years and then as a Guidance Counselor. During Ms. Stogdill's tenure, MPSD promoted her, making her responsible for additional duties and giving her areas of greater responsibility.

2. As a guidance counselor, Ms. Stogdill's responsibilities included counseling students on personal, social, and educational problems. She was assigned extracurricular responsibilities, including Orientation, and was assigned to be a sponsor for an after-school club known as "40 Assets." 40 assets is an after-school group of approximately 50 high school students, who engage in character and responsibility building activities.

3. MPSD relies on 10th – 12th grade students to administer the hands-on activities conducted by 40 Assets. These students apply for positions as officers of 40

Assets. The officers are required to commit their time and efforts to projects occurring on the weekends, in the evenings, and during the summer.

4. In her role as an MPSD guidance counselor, Ms. Stogdill communicated with many students face-to-face and communicated with student by telephone, email, and text message. At the direction of the MPSD athletic/activities director, 40 Assets sponsors gave their telephone numbers to the 40 Assets club members and officers. Other students contacted Ms. Stogdill to seek guidance, share their thoughts concerning their studies, discuss plans after high school, and many other topics.

5. During April 2015, one the 40 Assets officers during the preceding year, "K", began sending Ms. Stogdill text messages. As a 40 Assets officer, "K" was provided with Ms. Stogdill's telephone number and sent Ms. Stogdill text messages concerning her grades, college options, and her family's expectations.

6. In a text message sent October 26, 2016, "K" stated she was struggling, at her wits end, and wanting to end everything. "K" asked if Ms. Stogdill could meet to talk with her or to call her. Ms. Stogdill called "K" and, based on her education, experience, and training on suicide awareness, determined that "K" was stressed, but she was not suicidal.

7. Two days later, Ms Stogdill received a text from "K", informing her that "K's" parents were unhappy with Ms. Stogdill. "K" informed Ms. Stogdill that her parents planned to file a complaint against Ms. Stogdill.

8. Ms. Stogdill immediately notified MPSD. Later the same day, MPSD Assistant Principal Michelle Klug informed Ms. Stogdill she was being placed on paid administrative leave during MPSD's investigation into the situation.

9. The following day, October 28, 2015, Kevin Chick, MPSD Human Resources, talked to Ms. Stogdill, advising her that MPS was going to speak to "K"'s parents and to "K". Chick informed Ms. Stogdill that once those interviews were completed, he would then permit Ms. Stogdill to provide her version of the events. At that time, Chick explained only that the parent's complaint dealt with texting and requested Ms. Stogdill to provide MPSD with her cell phone records.

10. Less than one week later, Ms. Stogdill met with Chick, MPSD Principal Heidi Weaver, and a union representative. Chick presented Ms. Stogdill with a list of activities he asserted were "grooming." One of the activities Chick identified as "grooming," was texting. During the meeting Chick admitted that all the "grooming" activities he identified were not sexual, but nonetheless he advised Ms. Stogdill that MPSD could not trust her around students. As a result, Chick presented her with two (2) options: either resign or be fired.

11. As of October 2015, MPSD did not have a policy prohibiting teachers from texting students nor did MPSD adopt such a policy at the time of its investigation into Ms. Stogdill's activities. To Ms. Stogdill's knowledge, MPSD does not have such a policy as of today.

12. Many teachers and coaches text students either before, during, or after school hours. MPSD's treats teachers' texting of students contrary to its treatment of Ms. Stogdill.

  a. MPSD has lauded activities by teachers that involve the teachers in the lives of students before, during, and after school hours.

  b. MPSD presented a staff development event for teachers, which focused on the movie "Paper Tigers." The movie's premise was for teachers and

3

administrators to do whatever they can to build relationships with students and featured texting students as means of communications.

c. MPSD has failed to force other teachers to resign or be terminated for committing harmful and dangerous acts toward or around students, including:

   i. One teacher physically assaulted students;

   ii. An Assistant Principal called a student a "jackass" to get his attention at a football game. His contract was later cancelled based on sexual conduct involving a student.

   iii. Teacher Group D provided "Student Inspiration Comments" to seniors during Spring 2017, stating repeatedly to students "I love you," which were contained in MPSD publications.

13. MPSD never lodged a complaint with the Nebraska Department of Education against another teacher who engaged in the same or far more dangerous behavior than Ms. Stogdill. For example:

a. A social studies teacher appeared at an open house under the influence of alcohol. His breathalyzer results showed he was legally intoxicated. MPSD allowed him to resign.

b. A math and computer science teacher hit a student with his car. MPSD allowed him to resign.

c. An MPSD coach was aggressive with students, physically pushing one student against a wall. He also shouted, "F*** you," at parents during a girls' basketball game.

    d.     Another teacher and coach texted sexually explicit pictures to another MPSD staff member. MPSD allowed this teacher/coach to resign, which he did.

14. MPSD offered Ms. Stogdill her an option of quitting or being terminated as of November 2016, based on MPSD's perception that Ms. Stogdill is not a stereotypical female. Other MPSD employees who engaged in conduct of the same type – or worse— than Ms. Stogdill were allowed to resign. These other teachers were not reported to the Board of Education, the Department of Education and did not have their careers impacted.

15. Ms. Stogdill's employment at MPSD was evidenced by years of dedicated service, extra-curricular activities, and an exemplary performance record. She was forced to resign only because she was viewed by MPSD as non-typical and engaged in a life relationship with another female.

16. MPSD's treatment and forced resignation of Ms. Stogdill violated federal and state laws prohibiting discrimination based on sex and gender.[1]

## PARTIES

17. Jill A. Stogdill is a Caucasian female, aged 37. She resides in Omaha, Nebraska.

18. MPSD is a political subdivision of the State of Nebraska. MPSD is located at 5606 S. 147th Street, Omaha, NE 68137.

---

[1] Nebraska Fair Employment Practice Act; §§ 48-1104 and 48-1114(1); Americans with Disabilities Act, 42 U.S.C. §12101 et seq.; Nebraska Disabilities, Neb. Rev. Stat. §48-1101 et seq.; Title VII of the Civil Rights Act of 1964, as Amended, 42 U.S.C. § 2000e-2, et seq.

## JURISDICTION & VENUE

19. This matter arises under federal and state law. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 based on Ms. Stogdill's federal claims set forth in this Complaint. This Court has supplemental jurisdiction of the Nebraska state law claims pursuant to 28 U.S.C. §1367.

20. Venue is proper in this District pursuant to 28 U.S.C. §1381(b)(2), because the acts complained of here were orchestrated from, planned in, and conducted in this District.

21. Ms. Stogdill has exhausted her administrative remedies. She dual filed a charge of discrimination with the Nebraska Equal Commission ("NEOC") and the Equal Employment Opportunity Commission ("EEOC"). *See* NEOC Charge NEB 1-15/16-6-44107-RS; EEOC Charge No. 32E-2016-00617. The EEOC issued its Notice of Right to Sue on January 17, 2018, which was not received by Ms. Stogdill's counsel until February 20, 2018. (A true and correct copy of the EEOC Notice of Right to Sue is attached as Exhibit A and incorporated here as if fully set forth.)

## CLAIM I

### MPSD VIOLATED TITLE VII
### OF THE CIVIL RIGHT ACT OF 1964 & NFEPA
### BY DISCRIMINATING AGAINST MS. STOGDILL
### BASED ON SEX AND/OR GENDER

22. Ms. Stogdill incorporates by reference paragraphs 16 inclusive, as if fully set forth.

23. According to Title VII of the Civil Rights Act of 1964,
    It shall be an unlawful employment practice for an employer –

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex;
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's … sex.

42 U.S.C. § 2000e-2.

24. Similarly, Nebraska's Fair Employment Practices Act ("NFEPA") provides:

> It shall be an unlawful employment practice for an employer:
> (1) To fail or refuse to hire, to discharge, or to harass any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's … sex.

25. MPSD failed to treat Ms. Stogdill as it expected a stereotypical female to act. Instead, MPSD subjected her to treatment more harsh than other teachers, demeaning her performance, chastising her for carrying out her responsibilities, ridiculing her, making sport of her lifestyle, living arrangements, and physical attributes.

26. In addition to the individuals and activities identified above, *see* ¶¶ 14.a. – d., *supra*, MPSD treated Ms. Stogdill more harshly than other teachers. MPSD's reasons for Ms. Stogdill's termination, that she was a threat to students and could not be trusted, are not credible. She received no prior disciplinary actions and was regularly reviewed as an exceptional employee. Other employees who engaged in one-on-one time with students, including texting, were not punished, they were celebrated.

    a. Heather Phipps, part of MPSD administration, documented an encounter with a student that is remarkably similar to that experienced by Ms. Stogdill:

7

> [I] had one of those moments recently that all educators have. I saw a former student and was reminded of the impact that we have on the young people in our care. In a brief encounter, **she hugged me no less than five times. Our connection is deep.** Middle school was not an easy time in her life. She struggled with behavior; she wrestled with friendship issues; and she lost a parent. **We spent countless hours together in my office** working through issues

https://heathercphipps.com/2016/01/16/%EF%BB%BFhugs-hive-fives-and-hope/ (emphasis added.)

b. Facebook posts by one teacher responded to the following statement from a student," From walking in late every day as a freshman to senior year coming to your class just to see you." The teacher responded, stating the student "had a fire inside of her that I loved seeing (and hearing) every day."

c. Another teacher posted a picture of a volleyball and macaroni and cheese on Facebook, with the statement: "Found this gem in my room today from a student for my birthday . . . my favorite food and a volleyball with get to know you questions on it! Best birthday present ever. So thoughtful #feeling loved.

d. Another teacher posted on Facebook a comment about a student's gift to her: "Another dream come true courtesy of teaching. I mentioned in class last year that I'd always wanted an authentic Harvard sweatshirt. Thanks to a very dear student, I finally have one! #lovemyjob #bestkidsbestcoworkers.

e. Another student posted to an MPSD teacher's Facebook page, "you made us pull out our phones and add your number to our contact list with instructions to call you if we ever got in trouble or needed someone to talk to. At the time, this struck me as odd: very few teachers ever gave out their phone number to their student, but it made me feel so cared for. * * * I hope to bring my students the same assurance that they are respected and cared for in my classroom."

8

27. In sum, MPSD treated other teachers more favorably than Ms. Stogdill when the teacher involved was stereotypically female or was male. This treatment held true even when the teachers involved engaged in behaviors far more dangerous and invasive than Ms. Stogdill 's behavior.

WHEREFORE, Ms. Stogdill requests judgment ordering an award of damages pursuant to 42 U.S.C. § 2000e-2 and Neb. Rev. Stat. § 48-1119(4) based on MPSD's discriminatory terms and conditions of employment.

### REQUEST FOR RELIEF

Ms. Stogdill requests judgment in her favor and awarding her the following:

1. Damages for Ms. Stogdill's lost and future wages based on her termination;

2. Damages for Ms. Stogdill's emotional pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life;

3. Punitive damages for MPSD's knowing violation of federal discrimination laws;

4. Costs and attorney fees; as allowed by law, and

5. Such other and further relief as the Court deems appropriate.

**PLAINTIFF MAKES DEMAND FOR TRIAL BY JURY.**

DATE: May 18, 2018.

                **JILL A. STOGDILL, Plaintiff,**

By: */s/ Terry A. White, #18282*
Terry A. White, NE # 18282
**CARLSON & BURNETT LLP**
816 South 169th Street
Omaha, NE 68118
Direct (402) 682-8006
Main (402) 934-5500
terry@carlsonburnett.com
*Attorney for Plaintiff*